All right. Good morning, Your Honors. Good morning. I'm a new appellate counsel for the plaintiffs in this action, American Disabilities case. I didn't write the briefs and was not involved in the trial court. Well, then maybe you can tell us subjectively, doesn't this come down to a contest between the two experts? Two, I'm sorry, sir? Experts. Experts. No. No, I don't believe so, Your Honor. And in fact, that's where I was going to start. As appellees even recognize that in the – in their brief, in page 26, where they're defending the summer judgment motion, they said that there was diametrically opposed testimony. That diametrically opposed testimony appellees are referring to are the plaintiff's experts, which said that this ramp was greater than 8.33. And the plaintiff's – I mean, the defendant's experts said the same thing, but said that it substantially complied with the law. Now, in my view, that's not – that's not good enough, that the American Disabilities Act is a remedial statute. Thirty-six years ago, in 1967, a report of the National Commission said, as clearly as a no white only – or as a white only sign, the stairways, narrow doors and sidewalk curbs of our society indicate to handicapped persons their exclusion from the centers of their lives. Can we go back to what you just said? Sure. I thought – when we finally got to trial in this thing, I thought that Mr. – that the expert for the – for the defendants said it met – it was 8.3, or it was – it satisfied it, it was 8.3, not it was over. That's right. But that's finally where it ended up, and that's who the district judge believed. After – this was after their own experts had – had said that it was noncompliant. But, yes, at trial, one expert – or two experts did say it was compliant. The problem we have – For that, there was an expert who said it was – it was 8.3, but there was maybe some overage, some small overages, which was in an industrially accepted tolerance. That was earlier, and that's what caused the district judge to go to trial on this thing, because he didn't think the evidence was well-developed on what were acceptable tolerances, correct? Yes, Your Honor. Okay. But that is to – So he decided to go to trial on this, and he had the trial, and so I guess you have to argue that this should never have been a trial, and that he was totally wrong on that, or he was just wrong enough on that. That's – that's the first argument on the summary judgment, but that was moving toward the trial, and I don't think any court in the country, and I've looked long and hard on Lexis, has found that anything, you know, close to what we have here, which was a 9.3 slope over 35 percent, was sufficient. Now, wait a minute. Now, you said – hold that. A 9.3 slope. I thought the defense expert says it's 8.3, which is acceptable. And then we get to the issue that on the trial, which is what I would like to raise I guess getting back to your central point, here's the district court judge. He hears all these experts that talk from both sides, and he said, you know, this isn't appropriate for summary judgment. I want to hear the evidence. What's wrong with that? Well, the first – I mean, this is an unusual case, because usually – well, I mean, usually plaintiffs want to go to trial. They want their experts on there. They think they can persuade on a burden of proof. But you're saying, no, forget the trial. We've – you know, it's a – No, it was a prelude to my second argument, which is the trial, and it's also a strong argument. But the argument on the summary judgment is that there is no room in the American Disabilities Act for non-grant of summary judgment where both the plaintiff's expert and the defendant's expert say that it's noncompliant. Now, it isn't for the expert to decide whether it's substantial and complied with either California or Federal law. It was for the court. So we believe this panel should rule that when you have both of them saying that it is not compliant, then you – on the numbers, not on whether or not they believe that the law enforces the same result. Right. But, you know, generally – Go ahead. Sorry. Okay. I'm sorry. No, no. We don't review the decision of the district court judge as to whether there's a genuine issue of material fact. And he said there is. That's an unreviewable decision. I understand your point that he should have. You think there was an undisputed fact. But generally speaking, that's an unreviewable decision if – Generally speaking, and that's why I wanted to usher into – I think that that decision ushered directly into the Errors Act trial, which are that at some point, there is no such thing as a rule of law under the ADA, under the Slope Rule, if judges are permitted, as in this case, to make the kind of distinctions that were made in order to disqualify or not believe the defendant's experts. In this case, the court, Judge Walker held that he was going to listen to Mr. Guestin, and that one of the reasons for that was that he was not a paid expert. In fact, he was the one that built the slope and obviously had a substantial interest in the case. There are a number of – on page 13 of the reply brief, there are a number of similar situations in which, for example – But he also – I mean, it is – I understand your position that a judge should make a statement that he doesn't believe experts because they're paid is somewhat open to challenge. But he went beyond that and then accepted – in the contest between the two experts, he accepted the testimony of the defense expert who said it did comply. It's pretty hard to overturn that kind of a determination. I don't know – I have no idea which expert was right. On what the slope was. I think you're, of course, right, Your Honor. In a normal case, substantial evidence is all that's required, and the expert testimony can be ruled on as the judge sees fit. This isn't a normal case. This is a remedial statute involving 43 million disabled people. And if the sorts of arguments made in this case to – Well, let me ask you to get this particular case for the moment. Let's say we have a totally new judge, new history to the case. Everything goes along normally, and you get to a trial. And each side produces an expert. And they're both qualified people. And one tells the judge, the slope is 8.3. And the other guy says, no, I measured it, and the slope is 8.5. And the judge listens to them both and says, well, I've heard what kind of measuring device each one uses. I've listened to them. I've looked at them. I've reviewed their records. And I find the guy who says it's 8.3 is more credible. Is there something wrong with that? Is that somehow contrary to the Act? Your Honor, without any standards, for example, the judge said, I believe you because you're taller, then we wouldn't be here today saying that. I looked at your background, your history, your experience, and I looked at the devices you used to measure them. I examined the two ways, the ways you each did it. And I've listened to you both. And I've looked at your histories. And I find that you're more credible than the other one. I mean, isn't that the kind of judgment judges make? It is. But I don't believe so in this case, Your Honor. And I think just the number of, frankly, irrational moves to disrespect one side of the case does present this Court the question of whether or not the American Disability Act deserves some limits. For example, the expert he utilized normally uses a two-foot rule and didn't in this case. There was no reason why. But that's kind of quibbling with the evidence again. I mean, he just concludes the evidence fails to establish that the remodeled interior ramp slope is greater than the permissible slope requirements imposed by the ADA. I mean, that's his conclusion based on the evidence. And if he does, if there is support for that conclusion in the trial record, you dispute that. You say he shouldn't have reached that conclusion. But it's awfully hard to overturn that factual finding. Your Honor, I think that at some level the, for example, the other point he made was that 9.33 was all right because the carpet was squishy. You know, I just feel that. Where does the judge say that? I can find it by rebuttal, Your Honor. The point being that if the judge has allowed any criteria to determine which expert is correct, then essentially we're allowing the trial judges to vitiate the American Disabilities Act at will. And if, I think it is time for. So what's the rule that you would say that you only get to, you can't say, we can't have a rule that only the plaintiff's experts get to be considered in ADA cases? No. But we could say that there's no such thing as substantial compliance with the ADA and that the squishy carpet doesn't change that. But he didn't say substantial. He said it complies. That's his conclusion. Yes. The substantial compliance I think you were talking about was at summary judgment. Right. Correct. Okay. Right. So but let's leave that issue aside for the moment. If we're talking about the trial, there's really no basis for overturning that. Actually, the conclusions of law, in one part it says that the, there was no more than one foot that did not comply, and then in another part it said it complied. So he had ruled earlier in the memo that one foot didn't make any difference. So that's the kind of compliance, Your Honor, is just a conclusion. It's a term of art, really, in the sense that, for example, if he had said that 9.33 substantially complied, we would be asking this Court to find, to state a rule of law. In this case, we have such disparate reasons for the conclusion that one expert is better than the other that it essentially provides no principles for the district courts and allows them to rule however they like, in any case they like. Okay. Thank you. And if the Court has any questions on the standing issues, Mr. Brisbane, or Brisbane has already, or has standing according to the briefs, so we needn't go much farther. But the McMahon argument I think is handled in the briefs adequately. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Mark Peters, and I'm representing defendants and appellees. There was an issue that ran throughout the entire case that went from the summary judgment stage all the way through the trial, and that was how to measure the slope of the ramp. The testimony was there were several ways to do it. You can use a transit. You can use a ten-foot straightedge with a level on top of it. You can measure the rise and run and do the math. Or you can use one of these new tools that have come out called a two-foot, quote, smart, unquote tool. And like when they put smart on things, it's generally not all that smart. What this thing does is just tell you what the angle it is at, if it's calibrated correctly. There wasn't any dispute that that was the most inaccurate way to measure the slope of a ramp that has carpet on it. And that's so because in measuring such a short run, it only takes a very minuscule bump at the uphill end of the level or a trough at the downhill end of the level to throw that measurement completely off, to take a compliant ramp and show that it is in excess of 8.33. Plaintiffs advocated throughout that the Court adopt a standard, that the Court in essence legislate a standard and add it to ADAG, that if they could drop a two-foot smart tool anywhere on a carpeted ramp and get a numeral greater than 8.33, that was the end of the factual discussion. The trier of fact didn't need to do anything else, didn't need to consider any of the other methods of measurements, didn't need to consider problems with it. And this is a standard that would benefit the plaintiffs bar in ADA cases tremendously because, as shown here, they can take a compliant ramp, put this smart tool, and what they do is they walk around with it and put it all over the place until they get a numeral that's greater than 8.33. We advocated that that was not the correct way to measure the ramp. To clear up one little bit of confusion in the record, Mr. Scaff, our previous expert at the motion for summary judgment stage, found one short section that measured in excess of 8.33. He opined that that was all right pursuant to a doctrine called construction tolerance. Mr. Scaff, we had to substitute Mr. Scaff, as is in the substitute, Mr. Blackstaff for Mr. Scaff is in the record because Mr. Scaff became uncooperative with us as we approached trial. Mr. Blackstaff's survey of the ramp indicated that it was completely within or less than 8.33. So at trial, that's why the slight change there that we went with the motion. You went with the bottom line you liked better. Yes. Yes. Absolutely. But even with Mr. Scaff, we argued that the one section that he found just wasn't an appropriate way to measure the slope of that ramp. Which ramp was Scaff measuring? There were three iterations of the ramp in question. Mr. Scaff was measuring the latest iteration of the ramp in question. There was other testimony as to the prior two iterations of the ramp, how they were constructed, and that none of them exceeded 8.33. So that was our position on the motion for summary judgment. As to standing, I just want to make one point. We're talking about Mr. McMahon only. Well, what's left of the motion for summary judgment now after trial? It's a good question, Your Honor. After they failed to carry, after plaintiffs failed to carry their burden of proof at trial, we would say very little. I suppose there could be a legal mistake that lasted through the trial, but. Well, suppose the judge was wrong and they were entitled to summary judgment, but then at trial you prevailed. Couldn't they win on the basis that the court erred in not granting them summary judgment? If the court was incorrect, you're saying. Yes, if the court was incorrect. We argue, of course, that he was not. Of course. And we would argue that having gone through the actual evidentiary portion of the trial, having it all heard, and we think. This is a little like the indictment theory, that it really doesn't matter whether you got flaws in the indictment because it was at trial and the jury heard everything and they convicted them. So what, that there were constitutional errors in the indictment? Well, that's a theory in the law which has found fairly substantial acceptance, but I'm not sure that's the same thing with summary judgment. If you're, if you, if party A is entitled to a verdict or a judgment on summary judgment and is erroneously deprived of it, I would think that that party would be entitled to a reversal on appeal, regardless of what happened at the trial, because there never should have been a trial. And the court would remand it to have a trial that's already taken place? Oh, no. You wouldn't have a trial. I see. They would have won on summary judgment. And the trial would have been held in error. And we have two inconsistent results in the same case, Your Honor, which I would argue isn't a good thing for the administration. I don't, I said I would think that would be the result, but I don't. So what, I'm sorry. Why did you move for summary judgment? Because we felt the ramp was, did not have a problem. So you thought there were no undisputed facts either? We thought that the ramp measured appropriately with, measured appropriately. Absolutely. Pardon? I mean, you went to the, I mean, you're, I realize you take the record to find it, but at the time, both of you said, well, we're both right, and we're right as a matter of law, and you accept our measurement. And we both lost. Yeah. And it seemed to me to be a classic dueling experts case where the Court was correct in saying neither one of you has carried the burden on motion for summary judgment of eliminating triable issues of material fact. And that's why we argued that the Court did the correct thing there. Right. But I think, getting back to Judge Reinhart's point, if, in fact, the opposite result had occurred, if you lost a trial, I suspect you'd be up here arguing that he should have granted summary judgment for you. We would. We would, Your Honor. And so this inconsistent result problem that you're tendering really, you know, is only expedient to your argument today. I take your point, Your Honor. But I still think mine is a good one, that to remand after there has been a trial and plaintiffs haven't carried their burden of proof, or to decide it and to ignore the fact that a trial took place and plaintiffs didn't carry their burden of proof, I think puts the Court in a troublesome position, to me at least. Well, I think that would be so, but their argument is that there's, I mean, if, in fact, there was no genuine issue of material fact and the question was substantial compliance, one of law, and whether that fit under the ADA, then that's an entirely different question. It seems to me that's a matter of law. And the interesting thing is if the theory changes by the time of trial, does that cure the error, if any, at summary judgment? And that's something we have to think. Except, Your Honor, that we took, if you will, a harder approach at trial. We didn't try to weasel out. We made an argument on the motion for summary judgment initially that, you know, this is close enough. And if the Court looks at the order on the initial motion for summary judgment, the Court said, no, you can't be close enough or go over the ramp slope limitation, and it's okay because it's not preventing anyone from access. The Court ruled that we had to prove that it was correct, and we did. So you spent a lot of money defending this case. Why not just build another ramp that was clearly in compliance? Because my clients believed that there was nothing wrong with this. There was quite a bit of it's the principle in this. Frankly, was it an appropriate economic decision? Was it a correct economic decision? That's irrelevant. You can legitimately question that. But it was the principle of the thing. The Court's aware, I'm sure, of the greater political situation surrounding these sorts of cases, this sort of litigation going on. But you only have one theater that has an ADA compliant. You have only one theater that's wheelchair compliant and arguably wheelchair compliant, and it rotates the movies. That is a burden for people who have disabilities. It is, but it's appropriate pursuant to the ADAG guidelines, Your Honor, that when you have a hardship in renovating an older theater like this and you can't make these were former balconies that were made into auditoria upstairs. And ADAG says that when you do that, if you employ an appropriate film rotation policy, that's all right. And that was one of the issues that the Court found on summary judgment, that we did employ an appropriate film rotation policy. And for that reason, having an accessible auditoria was permissible. Well, Spy Kids was a lousy movie anyway, so I don't think he missed anything. I'll figure out whether it matters later. But just get my mind clear on the facts here. At the time of summary judgment, were there really two experts, one who said it both of whom said it's not 8.3 and one of whom said it's not 8.3, but it doesn't matter because under industry standards, we think of it as 8.3? Plano's expert said it didn't comply. It was too steep. Mr. Scaff, our expert at the time, said that it was compliant throughout, except for one short section he found that he could measure at about 9 percent. And he said, he opined, that in his experience, that was routinely found to be permissible under the construction tolerance dimensions theory under ADAG. Okay. Now, we didn't pursue that at trial because we pursued the theory that it was not. But it seemed to be the reason that the judge decided that he had to go to trial. I don't think so. In reading the judge's comments on that, he said we obviously have different measurements here, and they appear to be the result of the manner in which those measurements were taken. And that has been our song and dance for the entire case, that you can control the result by the way that you measure. And using these short little runs to measure it is more inaccurate than any other method and more likely to introduce error into the process. One of the arguments that's raised is, well, if you don't, if you do, if you measure it in too long a manner, you're going to ignore some obstacles on the ramp that can't be overcome, that get, that shouldn't be there. That you might average in a section of the ramp that was impermissibly steep. And we didn't take the position that you can't use a two-foot smart pool for anything to show anything like that. And if there had been an impermissibly steep section of the ramp, that was something that they could have pursued, we attempted to prove that there was not at trial an impermissibly steep section of the ramp, and I thought we carried our burden on that. As to standing, as I understand the argument of plaintiffs now, it is that Mr. McMahon acquired standing by his use of the theater before we owned it. And the testimony in the record before we owned it is that Mr. McMahon was a regular patron of the theater. He used the ramp in his wheelchair without assistance and without incident at all times. Now, that's not, you know, encountering a concrete barrier to access or suffering a concrete injury. So I don't see that they can bootstrap in with the pre-ownership, pre-our-ownership conduct of Mr. McMahon, where he didn't encounter any barriers to access, and bootstrap that in. As you know, once we owned the theater, the only concrete injury alleged by Mr. McMahon was he went to the theater to see a movie that wasn't showing in the accessible auditorium. And the judge found that because we employed the film rotation policy, that was not an actionable claim. In any event, the finding on standing would be harmless error if it was incorrect, because all of Mr. McMahon's claims were decided identically against Mr. Brisbane. They were the same claims, that there wasn't – that the ramp was too steep and that there wasn't knee space under the sink. And both of those were decided in our favor with regard to Mr. Brisbane. I'm not going to spend a lot of time on the notion that the Court was unfair to plaintiffs. The only real factual argument they make is that the Court should not have allowed us to replace Mr. Scaff with Mr. Blacksett. That seemed to me to be a fairly ordinary decision of a court in dealing with defendants who, through no fault of their own, are left, as they approach trial, with no expert. So I don't see any obvious prejudice or any prejudice at all from that. Plaintiffs' request to substitute an expert at that time and until today, they've never explained why they needed to substitute an expert. They had Ms. DeLille, who was an ADA compliance expert, and they had Mr. Clapp, who was a construction expert. Mr. Blacksett had a little of both of those qualifications. So there really never was articulated a reason why plaintiffs were prejudiced with that substitution. The request to amend the complaint I'll deal with just briefly. There were two half-hearted, I think is a charitable way to describe them, requests to amend, one to show that the locked bathroom door was a violation of ADAG. The Court didn't allow that because there was no standard anywhere that said that that would have violated ADAG or the ADA. And it was never pleaded. Plaintiffs attempted to bring it up at trial for the first time. As to the attempt to bring in evidence about the hardship exemptions, there never was an issue about hardship exemptions. This goes to whether we could create inaccessible auditoria when we remodeled the place, and you have to have a hardship exemption to do that. Mr. Kemp, in the motion for summary judgment procedures, we had a declaration of Mr. Kemp, the building official. It's at 478 lines 11 to 15, where he says there was a request for hardship exemptions and he granted them. So that issue was taken care of in the motions for summary judgment and did not need to be dealt with at trial at all. Unless there are any further questions, I'll suspend. Kennedy. I want to just go on and reopen this debate, particularly for Long, but I want to make sure I understand this. The what the court said at the time of summary judgment is that your expert said the deviation in that small quantity of the small portion of the ramp was permissible under the dimensional tolerance provision of the ADAG. He then says, were there such deviations lie within the range of permissible dimension of tolerance does not appear to be an issue that could be resolved on the present record. Now, isn't, wasn't that a legal question? Whether the regulations, when they talk about dimensional tolerance, whether that means you can have a small portion that deviates? Wasn't that what he was talking about? The question was what the slope of the ramp was, which was a question of fact. Now, he says it's whether it's permissible under the dimensional tolerance provision. And that was Mr. Scaff's opinion about it, and I think About the regulations. That's true, but I don't know why you wouldn't characterize that as weighing the competing opinions of experts. Well, no, I mean, it's undisputed that it's in excess of the ADA limits and that, but falls under an exception, which is not recognized, then I think that would be appropriate for summary judgment. At trial, we argued that it was acceptable, okay, that it did measure. No, I understand that. We're focusing on the summary judgment hearing. Let me ask it a different way. Do you believe that your expert's statement of the regulations is accurate? Yes. Yes. And we argued as well. Did you cite the dimensional tolerance provision and put a copy of it in the record? I don't remember. Is it easily findable? I can look and address that in a letter brief, Your Honor. I don't recall. My recollection is that I don't recall any specific citation to the dimensional tolerance provision. My recollection is only of Mr. Scaff referring to it in his report, and I don't recall whether it was attached to that or not. Well, see, that's a critical issue right here, at least as the remaining issue, is that your able opponent says there's no such thing. That's an error of law. And that's why I want to move to the other argument we made, Your Honor, which is that measuring it in a short section is not the way to do it. It's the most accurate way of doing it. Well, that's a different, though. You don't know the answer to the question, I take it. But I can address that in a letter brief if the Court would like me to. But we'll let you know if we need further.  Thank you, Your Honor. Please, the Court. I think at first we need to put a very fine point on the summer judgment issue. There was one response in the appellee's brief. It's on page 26. The argument is, is that the diametrically opposed testimony of the party's experts at summer judgment created a classic genuine issue of material fact requiring resolution at trial. They finalized the paragraph with, When the question is viewed in light of the entire record, there can be little doubt that a genuine issue of material fact existed, and therefore, the trial court correctly denied appellant's summer judgment motion. Now, the actual testimony is very short and it doesn't bother the Court. I'll read it. It's only a few lines. I believe that this is the expert testimony of the appellees at summer judgment. I believe that the interior ramp to accessible theaters generally complies with new construction requirements for surface slope, although one short section of the slope has a ramp of 9 percent, approximately 9 percent. I believe that the ramp is compliant with the requirements of the ADA and ADAG based upon Department of Justice construction tolerance rules. Now, number one, it's not his job to make that legal finding. It was the Court's job to make that legal finding. Number two, as I mentioned before and it was not disputed, we found no court in the country that's ever found construction tolerances to allow substantial compliance where the ramp is over 8.33. Right. But he's talking about the Department of Justice implementing regulations. Do you know what he's talking about there? No, not really. And it's partially because I'm not a disabilities expert, but either way, I don't believe that the expert. You don't know about the Department of Justice construction tolerance rules? Oh, no. I have that and I can find the pages in the record of it. You can. I'm not sure that which body of law it comes under, what type of regulation precisely. Well, then what is it you're going to find in the record? Well, the citation, I guess, it says 3.2 of the ADAAG supported by the publication Handbook of Construction Tolerances by David Kenneth Ballast. And you say that that doesn't say that, right? No, I said that no court has allowed it to go over the 8.33 allowance. That I have found it through substantial research. And there's not the rule. It exists. There is such a rule, but no court has yet applied it, right? Well, Your Honor, let's see. Has any court said we can't apply it, it doesn't apply? I don't know. I'm going to make the argument to this panel that this Court should do precisely that. And the reason is in part what was said by Appellee's counsel, which is, you know, when you have a rug that comes up a foot and you make and you do the measurement, if you're on the wheelchair, it doesn't really matter very much. That is not the sort of construction, constructional tolerance we're talking about. And 9 percent is a field compared to 8 percent. But there's a specific regulation on that. So it really doesn't – I mean, I understand your practical argument, and it has some force in the real world. But if you're arguing as a matter of law and there's a regulation that seems to be on point that allows it, then how can you say it's a legal error? I don't see that it allows it to go over the standard. I think the 1 to 12, the 8.33, trumps any of the constructional tolerance rules. What's your best case on that? You don't have a case either way on that. If there's a regulation and there's no court case, it doesn't mean that the regulation isn't effective. The ADAG controls in general, not that it – from what I've read in law reviews, but the main point is it's a legal finding, and at some point, some court has to determine it. And if Judge Walker determined it wrongly, then it's appropriate for summary judgment. Well, I may have the wrong regulation in my materials here, but it talks about floor finish tolerances may be specified – they're talking about allowable tolerances. Floor finish tolerances may be specified by the traditional 8-foot straight edge method as shown in the diagram or the newer F-number system. The F-number system is a statistical method to measure and specify both the local flatness and the floor goes on and on and on. I mean, it's pretty specific. So that's a factual question of whether or not it complies, not whether or not the regulation – if your argument was that the regulation is inconsistent with the statute, that wasn't preserved at the trial, it doesn't seem to me. It wasn't argued by the appellees. That's the problem. We argued that given that the 1 through 12, or 1 to 12, 8.33 control. Yeah. And so this Court would have to find otherwise in order to agree with Judge Walker, I believe. Well, Judge Walker says these discrepancies in the measurements of the slope demonstrate the existence of a genuine factual dispute concerning the slope of the interior ramp before it goes on like that. So he's finding a factual difference. And you're saying this one expert relied on construction tolerance and he wasn't permitted to do it. We have a regulation that says he's well within his right to do that. You say the regulation is noncompliant with the statute, but that's nowhere in this case, as far as I can tell. But no point does it – from what I understand – You don't know the regulation here. From what you just read, Your Honor, no point does it indicate that it can overcome the basic – the rule on the slant. It talks about allowable tolerances, though. See, that's the problem, I think. So there's an argument that wasn't developed at the time of summary judgment. So then we have a trial where this issue becomes irrelevant, and so you would have us go back to reconstruct an argument which wasn't developed at the time of summary judgment. Isn't that a problem? I'm not sure it wasn't developed, and I didn't look into it because there was only one answer that the appellees gave, and the answer was that it raised a genuine issue of fact. Right. But, see, that's – the problem with that is, it's – that decision alone is not reviewable unless there's some legal error. And you started off, I thought, at an interesting argument that there was legal error because as a matter of law, you can't consider construction tolerances. But I just looked at the expert's declaration. He cites the – he cites the regulation. He attaches the regulation. The regulation provides for construction tolerances. And so the only thing you're left with is to argue that the regulation is impermissible under the statute, which was not argued at summary judgment. Which is an – which is a question of law and interpretation, which under a remedial statute, I can't – I can't fathom that this panel wants to be the first in the country to hold that this law can be greater than 8.33 under that provision. And the reason is because of the remedial provision. But you don't even have to hold that. We just said there was a – whether or not it fit or not was a question of fact at trial. And at trial, unfortunately, the issue disappeared because it became a disputed issue of fact. It was certainly raised that substantial compliance wasn't sufficient, and that's enough to preserve the issue, I believe, Your Honor. And it's not a matter of going into details on the Department of Justice because one expert added that as a part of his tagline on an issue of law that he couldn't even resolve. Well, it's not a – it's not a tagline. It's a regulation. I mean, that's the – basically, in all these ADA cases, we look to the Attorney General's guidelines for compliance. That's – we heard a case the other day where the – where noncompliance with the Attorney General's guidelines was the key question. That's usually the affirmative pleading of the person who's seeking relief under the ADA. And so here, you're saying, well, that doesn't matter. And it probably does. That's the framework in which we decide these ADAs. I think what I'm saying, Your Honor, is that the issue is preserved because we argued that it was not a substantial compliance. Then it's a question of law, not for the expert, to determine whether or not that provision allows greater than an 8.33 slope. So the issue is preserved, and it leaves it to this panel to decide, is our position. And to Judge Reinhart's point, given the cross motions for summary judgment and the remedial nature of the ADA, this would be a perfect place to make just that determination. All right. Thank you, counsel. Thank you. The case is argued and will be submitted. The Court will stand in recess for the day.
judges: Reinhardt, Thomas, Restani